KERRY J. JACOBSON
Wyoming State Bar # 6-2966
Assistant United States Attorney
District of Wyoming
P. O. Box 449
Lander, Wyoming 82520
(307) 332-8195
kerry.jacobson@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Criminal No. 19-CR-92-SWS** |
| | ) | |
| **AUSTIN JAMES KELLY,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

## I.   FACTUAL BACKGROUND

On February 27, 2019, at approximately 6:19 a.m., Wyoming Highway Patrol Trooper Richard Scovel was dispatched to assist a motorist who had been driving a U-Haul truck that was off the roadway and stuck in snow near milepost 121 on Highway 120 north of Cody, Wyoming. A Wyoming Department of Transportation snowplow had gone by the U-Haul truck and seen it stuck in the snow off the right side of the road. The plow reported to the dispatch center that a trooper or a wrecker would need to respond to get the vehicle out of the snow.[1]   As Trooper

---

[1] In preparing its response, the government learned the snowplow driver had a conversation with the Defendant, which had not previously been supplied to the government or the Defendant, and which was not known to Trooper Scovel at the time of the stop and is therefore not relevant to this analysis.

Scovel was arriving in the area of milepost 121 at approximately 6:54 a.m., he passed a U-Haul driving on the highway.  Trooper Scovel believed the U-Haul appeared to have just been driven out of the snow and back onto the roadway because it was not traveling fast.  As Trooper Scovel turned around to head back into town, he saw the snowdrift in which the U-Haul had been stuck and thought the U-Haul's front end might have damage due to the height and amount of snow in which the U-Haul had been stuck.  Trooper Scovel wanted to ensure the driver was okay and the vehicle had not sustained serious damage.  Trooper Scovel believed the U-Haul driver was likely not from the local area and was not familiar with Wyoming's crash reporting requirements.[2] Trooper Scovel wanted to verify there was not over $1,000 damage to the vehicle that he believed would require him (the Trooper) to write a crash report under Wyoming State law.[3] Based on his experience, Trooper Scovel knew it did not take an extensive amount of damage to reach the $1,000 threshold.  Trooper Scovel activated his lights and stopped the U-Haul truck. As he pulled the Defendant over, Trooper Scovel was not able to see the U-Haul's license plate because it was obscured by snow.

Trooper Scovel made contact with the sole occupant of the U-Haul, a male driver, and learned the U-Haul had been stuck in the snow but the driver dug it out by himself.  The driver

---

[2] Trooper Scovel eventually cited the Defendant with a violation of Wyoming Statute **§ 31-5-1102. "Duty to stop vehicle where accident involves damage to attended vehicle or property; penalty.** The driver of a vehicle involved in an accident resulting only in damage to a vehicle or other property which is driven or attended by any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible, but shall forthwith return to and remain at the scene of the accident until he has fulfilled the requirements of W.S. § 31-5-1103.  Every stop shall be made without obstructing traffic more than is necessary.  Any person failing to stop or comply with this section is guilty of a misdemeanor."

[3] Trooper Scovel believed he (the Trooper) would have the duty to write a report pursuant to Wyoming Statute § 31-5-1106 if the U-Haul had been damaged to an apparent extent of $1,000 or more.  Section 31-5-1106 states, **"Written report required of police officers. . . .** (c) Every police officer who investigates a motor vehicle accident resulting in bodily injury or death of any person or total property damage to an apparent extent of one thousand dollars ($1,000.00) or more, either at the time of and at the scene of the accident or thereafter by interviewing the participants or witnesses shall forward a written

opened the driver's side door of the U-Haul when speaking with Trooper Scovel. Trooper Scovel noted damage to the U-Haul truck's hood and grill and asked if the damage was recent. The driver told him it was not, whereupon Trooper Scovel asked for the rental agreement he saw behind the driver's seat. The rental agreement did not show damage to the U-Haul's hood or grill at the time it was rented.

While speaking with the driver, Trooper Scovel smelled burnt marijuana. Trooper Scovel asked for a driver license. The driver admitted that he did not have a driver license and could only produce an ID card, which identified him as Austin James Kelly. Trooper Scovel asked if there was marijuana in the vehicle and Kelly said, "a little bit." Kelly admitted that he took a hit of marijuana when he was getting the U-Haul unstuck from the snow. Trooper Scovel asked where the marijuana was located, and Kelly handed him a joint that was in the open console above the cup holders. Kelly said that was all the marijuana in the vehicle.

Trooper Scovel asked Kelly to get out of the U-Haul and come back to his patrol vehicle. Trooper Scovel let Kelly know that he (Scovel) was going to pat him (Kelly) down for weapons, since Trooper Scovel was going to put Kelly in Scovel's patrol vehicle. Kelly said he had brass knuckles in his back pocket. Trooper Scovel removed the brass knuckles, then continued his pat down and found a prescription pill bottle with pills and a coin purse in Kelly's left front jacket pocket. Kelly identified the pills as Lorazepam. He admitted the pills were not prescribed to him and said he bought the pills. Trooper Scovel also found another pill bottle in Kelly's jacket, which contained jewelry. Kelly said the jewelry belonged to his mother.

---

report of the accident to the highway department within ten (10) days after his investigation of the accident."

Trooper Scovel allowed Kelly to smoke a cigarette while he contacted dispatch. Trooper Scovel learned through dispatch that Kelly's Arizona driver license was suspended and the U-Haul was reported stolen.

Trooper Scovel arrested Kelly for marijuana possession, suspended driver license and possession of stolen property. When Kelly was booked into jail, a driver license belonging to Shaune E. O'Brien from Montana was located in Kelly's wallet.

Trooper Scovel obtained a search warrant and searched the U-Haul later that day. The U-Haul contained clothing, jewelry and tools that still had tags on them. Officers located credit cards and other cards that were later confirmed as having been stolen from Larry Mose in Phoenix, Arizona. In a charcoal-colored backpack in the U-Haul's front passenger compartment was a Remington RP9, 9mm handgun with serial number RP011729H. An ATF trace of the Remington RP9, 9mm handgun, disclosed that Shaune Elliott O'Brien, the owner of the Montana driver license found in Kelly's wallet, purchased the gun on November 16, 2017 at Quality Guns in Great Falls, Montana.

## II.   DISCUSSION

### *Fourth Amendment*

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures. . . ." U.S. CONST amend IV. Of the three recognized types of citizen-police encounters - consensual encounters, investigative detentions, and arrests - only investigative detentions and arrests implicate Fourth Amendment protections. *See, United States v. Hishaw,* 235 F.3d 565, 569 (10th Cir. 2000). The Defendant's motion challenges the traffic stop at its inception (ECF No. 25 at 3). Second, the Defendant contends, albeit in a footnote, that Trooper Scovel violated the Defendant's Fourth Amendment rights by

retrieving pill bottle(s) from the Defendant's jacket pockets during a search (ECF No. 25 at 2 fn. 1).

### A. Traffic Stop

A routine traffic stop constitutes an investigative detention or seizure that invokes the protections of the Fourth Amendment and is examined under the principles established in *Terry v. Ohio,* 392 U.S. 1 (1968). *United States v. Williams,* 403 F.3d 1203, 1206 (10th Cir. 2005). Under the Fourth Amendment, the touchstone of analysis "is always reasonableness in all the circumstances." *United States v. Holt,* 264 F.3d 1215, 1220 (10th Cir. 2001), *en banc.* Applying *Terry,* the reasonableness of a traffic stop is examined by a two-part inquiry: First, whether the officer's action was justified at its inception; and second, whether the officer's action during the stop "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (*citing Terry,* 392 U.S. at 20).

### 1. Traffic stop justified as community caretaking function

The Defendant has challenged the validity of the traffic stop. Here, the Trooper had been dispatched to "a slide-off," which the snowplow driver had indicated would likely require assistance to the motorist. When the Trooper got to the area, he saw a U-Haul that looked to him as though it had "just got going." When the Trooper turned to head back to town, he saw the snowdrift where the U-Haul had been stuck and believed the U-Haul may have sustained front-end damage. The highway road surface was partially snow-covered and the area was somewhat remote, with sporadic cellular telephone service. Trooper Scovel accordingly stopped the Defendant to ensure he had not sustained damage to his vehicle and to make sure everything was okay.

The Trooper's stop was reasonable under the circumstances. "Reasonableness under the Fourth Amendment 'depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *United States v. King,* 990 F.2d 1552, 1560 (10th Cir. 1993). The Supreme Court has recognized that law enforcement officers initiate encounters for a wide variety of purposes and that "[i]ndeed, police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *King* at 1560, *citing Cady v. Dombrowski,* 413 U.S. 433, 441 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973).

This is not to say that citizens lose their Fourth Amendment protections when a law enforcement officer does not suspect him of criminal wrongdoing. *See Camara v. Municipal Court,* 387 U.S. 523, 533, 87 S.Ct. 1727, 1731 (footnote omitted) (1967) (A person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a non-investigatory capacity). "Whether the seizure of a person by a police officer acting in his or her non-investigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or 'community caretaking function' and the individual's interest in being free from arbitrary government interference." *King* at 1560.

Here, Trooper Scovel was acting in his community caretaker capacity when he stopped the Defendant to ensure the Defendant had not damaged his vehicle in the slide-off and would be able to continue his travel safely. It is not surprising that such an investigation of vehicle accidents has been found to be within police officers' community caretaking function. *See Cady,* 413 U.S. at 441, 93 S.Ct. at 2528. "The fact that the officer may not suspect the individual of

criminal activity does not render such a seizure unreasonable per se; *Terry* only requires 'specific and articulable facts which . . . reasonably warrant [an] intrusion' into the individual's liberty." *King* at 1560, *citing Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880 (1968) (string citations omitted).   The area where the Defendant had slid off the highway into the snowdrift was somewhat remote, the highway condition was less than ideal and cellular telephone coverage was sporadic.   The Trooper would have acted with callous disregard for human safety if he had chosen to pass by the Defendant on the highway and simply return to town without checking on the Defendant's well-being.

> ### 2.    *Traffic stop justified by reasonable suspicion/probable cause of equipment violation*

An alternative justification for the traffic stop was the Trooper's reasonable suspicion or probable cause of an equipment violation.   "A traffic stop is valid under the Fourth Amendment if the stop is based upon an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Williams,* 403 F.3d at 1206 (*citing United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir. 1995), *en banc*).   Here, Trooper Scovel stopped the Defendant only <u>after</u> he had received a dispatch message that the WYDOT snowplow driver believed a trooper or wrecker would be needed to help pull the U-Haul driver out; <u>after</u> Trooper Scovel saw that the U-Haul had slid off into enough snow to potentially have caused front-end damage to the U-Haul; <u>after</u> seeing the U-Haul was not moving fast when he encountered it close to the location where the U-Haul had been stuck; and <u>after</u> observing the U-Haul's license plate was obscured by snow and unreadable.

Trooper Scovel may not have singled out the specific traffic violation that was the basis for the stop, and he may have included law enforcement responsibilities in his summary of

reasons for the stop,[4] but Trooper Scovel's subjective intent in stopping the Defendant is irrelevant. "Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis." *Whren v. United States,* 517 U.S. 806, 813 (1996). "Indeed, we will uphold a traffic stop as long as there was reasonable suspicion to stop the defendant for "'any one of the multitude of applicable traffic and equipment regulation' of the jurisdiction." *United States v. Botero-Ospina,* 71 F.3d 783, 787 (10th Cir. 1995) (*en banc*) (*quoting Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed. 2d 660 (1979)). *See also Eckhart,* 569 F.3d at 1271 (10th Cir. 2009) (upholding traffic stop despite officer's mistake of law because officer had reasonable suspicion to stop vehicle for another related violation of Utah law); *United States v. Eckhart,* No. 2:05CR529DAK, 2006 WL 1073465 at *3 (D. Utah Apr. 10, 2006) (state trooper testifying incorrectly about requirements of Utah law). So although a defendant need only violate one provision of a vast number of local, state, and federal laws to trigger criminal liability, police officers can argue they had reasonable suspicion to stop a defendant based on any number of those laws - even if the officer was mistaken about the specific law he thought the defendant was violating. A single mistake by a law enforcement officer will not necessarily invalidate the stop and any resulting search." *United States v. Nicholson,* 721 F.3d 1236 (10th Cir. 2013), abrogated on other grounds.

Here, Trooper Scovel clearly articulated that the Defendant's license plate was obscured by snow, which is a violation of the Wyoming law requiring vehicles operating on public roads to have a valid license plate/registration that is displayed properly and visibly on the vehicle.

---

[4] In his Search and Seizure Affidavit, filed in the Circuit Court, Fifth Judicial District, Park County, Wyoming, in support of a Search Warrant for the U-Haul driven by the Defendant (Attachment No. 1), Trooper Scovel stated his belief that there may have been enough damage done to the vehicle that a crash report may be required. To the extent that Wyoming law may have required a crash report, the report appears to be a function of law enforcement, not a potential criminal violation by a motorist who crashed only his own vehicle. *See* Wyo. Stat. § 31-5-1106.

Specifically, Wyo. Stat. Ann. § 31-2-205(a)(i) requires license plates be "conspicuously displayed and securely fastened to be plainly visible" on the front and back of the vehicle. Similarly, Wyo. Stat. Ann. § 31-4-101(a)(iii) prohibits any person from knowingly operating a vehicle with license plates/registration that is obscured so "as to prevent the license plate number from being easily read."  Likewise, Wyo. Stat. Ann. § 31-4-104 provides that the penalty for these license plate display offenses is a fine of not more than $750 and imprisonment of not more than six months.

As depicted in the attached image captured from the video of the stop, the Defendant's license plate/registration was not capable of being easily read, thus constituting a probable violation of Wyoming law.



The situation here is similar to that in *Clay v State*, 372 P.3d 195 (Wyo. 2016) where the Wyoming Supreme Court upheld a traffic stop based on the vehicle's temporary registration being obscured by a window's dark tint.

### B. Trooper's search of Defendant's pockets during traffic stop

Although the Defendant did not address the Trooper's search of the Defendant's pockets in detail, the government will address it briefly here.  The Defendant contends the Trooper exceeded the scope of a limited pat down for weapons under *Terry v. Ohio,* 392 U.S. 1 (1968) (ECF No. 25 p.2, fn.1).  However, the Trooper's search of the Defendant's jacket pockets was supported by probable cause to believe the Defendant possessed illegal controlled substances, and it was therefore permissible regardless of the fact that the Trooper referred to the search as a pat down for weapons. The smell of burnt marijuana itself has been held to support probable cause to search the occupant of a vehicle. *United States v. Hyppolite,* 609 Fed.Appx. 597, 605 (11th Cir. 2015) citing *United States v. Lueck,* 678 F.2d 895, 903 (11th Cir. 1982)("[T]he recognizable smell of marijuana gives rise to probable cause supporting a warrantless search."); *see United States v. Tobin,* 923 F.2d 1506, 1512 (11th Cir. 1991)(*en banc*)("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.")  The *Hyppolite* court concluded the detective also had probable cause to perform a warrantless search of the defendant's person, based on the strong odor of marijuana emanating from him that indicated the presence or possession of contraband. *Hyppolite* at 605. Here however, Trooper Scovel had more than the smell of burnt marijuana to support his search of the Defendant. Once Trooper Scovel stopped the Defendant, the Defendant opened the U-Haul's driver-side door while conversing with Trooper Scovel.  Trooper Scovel saw damage to the U-Haul's hood and grill and asked the Defendant whether the damage was there when the Defendant rented the U-Haul.  It was during that conversation that Trooper Scovel smelled burnt marijuana and asked the Defendant whether he had marijuana in the vehicle.  The Defendant admitted he had smoked

marijuana while getting the U-Haul unstuck and handed the Trooper a marijuana cigarette from the vehicle's console.  The Defendant said that was all the marijuana he had, although Trooper Scovel saw a container he believed was a marijuana container in the vehicle's cup holder.

Of course, once the Defendant admitted he had used marijuana and had marijuana in the vehicle, Trooper Scovel had also probable cause to search the vehicle.  Police may search an automobile and the containers within it without a search warrant when they have probable cause to believe it contains contraband or evidence of criminal activity.  *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798, 804-09 (1982).  *United States v. Johns*, 469 U.S. 478 (1985).  The search is justified because of the inherent mobility of the vehicle, *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam); *United States v. Chadwick*, 433 U.S. 1, 12 (1977), and because of a reduced expectation of privacy.

Trooper Scovel asked the Defendant to step back to his patrol vehicle and told the Defendant that he (the Trooper) was going to pat the Defendant down for weapons.  The Defendant told Trooper Scovel that he (the Defendant) had brass knuckles in his back pocket. Thereafter, Trooper Scovel felt a bulge in the Defendant's left front jacket pocket and removed a prescription bottle and a black coin pouch from the pocket.  At the time the Trooper conducted his search of the Defendant's person, the Trooper had probable cause to believe the Defendant may have controlled substances, specifically marijuana, hidden on him.  The Trooper's search of the Defendant was supported by probable cause and was therefore lawful under the Fourth Amendment. [5]

---

[5] In any event, even if the items taken from the Defendant's pockets during the first search of his person were a violation of his Fourth Amendment rights, the items would still be admissible under the inevitable discovery doctrine. Under the inevitable discovery doctrine, illegally obtained evidence may be admitted if it "ultimately or inevitably would have been discovered by lawful means." *United States v. Christy,* 739 F.3d 534, 540 (10th Cir. 2014) citing *Nix v. Williams,* 467 U.S. 431, 444 (1984). Here, Trooper Scovel arrested the Defendant once the Trooper learned the U-Haul was reported stolen. The Defendant was taken to jail where he was booked and his items were searched and inventoried. Thus, the items from his pockets would have been discovered upon his arrest.

**THEREFORE**, for all the foregoing reasons the United States respectfully requests the court deny the Defendant's Motion to Suppress.

**DATED** this 24th day of June, 2019.

Respectfully submitted,

MARK A. KLAASSEN
United States Attorney

By:    */s/ Kerry J. Jacobson*
KERRY J. JACOBSON
Assistant United States Attorney

## CERTIFICATE OF SERVICE

This is to certify that on the 24th day of June 2019, I served true and correct copies of the foregoing **Government's Response to Defendant's Motion to Suppress** upon counsel of record via CM/ECF.

*/s/ Kerry J. Jacobson*
UNITED STATES ATTORNEY'S OFFICE